1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

ORACLE AMERICA, INC., a Delaware
corporation, and ORACLE
INTERNATIONAL CORPORATION, a
California corporation,

        Plaintiffs,

        v.

CEDARCRESTONE, INC., a Delaware
corporation,

        Defendant.

Case No. 12-cv-04626 NC

**ORDER GRANTING MOTION TO
DISMISS SECOND AND THIRD
AMENDED COUNTERCLAIMS
WITH LEAVE TO AMEND**

Re: Dkt. Nos. 38, 39

    This lawsuit arises out of a dispute between plaintiffs Oracle America, Inc. and
Oracle International Corporation and their long-time partner, CedarCrestone, Inc.,
concerning CedarCrestone's conduct in providing support services for Oracle's PeopleSoft-
branded software.  Oracle brought this action for copyright infringement, breach of contract,
and related claims, asserting that CedarCrestone misappropriated Oracle's intellectual
property.  CedarCrestone counterclaims, alleging breach of contract and anticompetitive
conduct by Oracle.

    Before the Court is Oracle's motion to dismiss for failure to state a claim
CedarCrestone's counterclaims for (2) unlawful tying under the Sherman Act, 15 U.S.C. §
1, and (3) unfair business practices.  Having held oral argument on March 13, 2013, the
Court hereby DISMISSES with leave to amend CedarCrestone's second and third

counterclaims because CedarCrestone has failed to sufficiently allege the requisite market power in a relevant market.

## I. BACKGROUND

### A.    The Parties

Oracle develops, owns, and licenses intellectual property, including intellectual property rights formerly held by certain PeopleSoft entities, and provides related services. Dkt. No. 36 ¶¶ 9-10.  Until September 4, 2012, when Oracle purported to terminate the partnership, CedarCrestone was a licensed Oracle partner, and provided a broad variety of information technology services to Oracle licensees, primarily related to Enterprise Resource Planning ("ERP") software applications developed by Oracle.  Dkt. No. 30 at 28 ¶ 5, 48 ¶ 54.  Those services included consulting and advisory services related to PeopleSoft and Oracle E-Business Suites applications, hosting and management of PeopleSoft and E-Business Suites applications, and services related to tax and regulatory support for certain Oracle licensees.  *Id.* at 2 ¶ 1.

### B.    CedarCrestone's Counterclaims

Oracle's complaint asserts that CedarCrestone used its partnership relationship to misappropriate Oracle's intellectual property by selling infringing, unauthorized software updates for Oracle's software.  Dkt. No. 36 ¶ 1.  In response, CedarCrestone initially counterclaimed against Oracle for (1) breach of contract, (2) intentional interference with prospective economic advantage, and (3) unfair business competition based on Oracle's alleged pretextual termination of the partnership agreement and a "sustained initiative to destroy competition in the downstream market for consulting, support, and implementation of Oracle software."  *See* Dkt. No. 11 ¶¶ 53, 59, 62.

Oracle filed a motion to dismiss CedarCrestone's counterclaims for intentional interference with prospective economic advantage and unfair competition.  Dkt. No. 12. The Court granted Oracle's motion to dismiss with leave to amend, finding that CedarCrestone had failed to plead an "independent wrong" required to state an intentional interference or unfair competition claim.  Dkt. No. 28.  The Court explained that the

requisite wrongful conduct cannot be premised on Oracle's privileged litigation activities, or on the mere allegations of wrongful breach of contract, and that CedarCrestone had not adequately alleged a violation of antitrust laws or the "policy or spirit" of those laws. *Id.*

On January 4, 2013, CedarCrestone filed its First Amended Answer and Counterclaims, alleging a new claim for unlawful tying under the Sherman Act, 15 U.S.C. § 1, and repleading its unfair competition claim based on the unlawful tying allegations. Dkt. No. 30. CedarCrestone asserts that Oracle's termination of CedarCrestone's contracts and partnership status is "part of an unlawful and systematic attack on competition by third-party service providers like CedarCrestone, who for years have focused on assisting Oracle in the support and licensing of Oracle ERP software products." *Id.* at 26-27 ¶¶ 1-2. Specifically, CedarCrestone alleges that Oracle's anticompetitive conduct consists of unlawfully tying "the sale of updates to its proprietary ERP software—both formal, periodic releases of new versions of that software and patches and fixes to existing versions of that software—to the purchase of Oracle support and maintenance services." *Id.* at 37 ¶ 26. CedarCrestone further alleges that Oracle's unlawful tying violates section 1 of the Sherman Act, and also constitutes "unlawful, unfair, and/or fraudulent business acts and practices" prohibited by California Business & Professions Code section 17200. *Id.* at 56 ¶¶ 75-79.

Oracle now moves to dismiss CedarCrestone's antitrust and unfair competition claims on the basis that CedarCrestone has failed to allege facts showing Oracle's market power in a cognizable market. Dkt. No. 38. CedarCrestone opposes the motion, arguing that it has sufficiently alleged an aftermarket tying claim under *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992).

**C.    CedarCrestone's Allegations of Unlawful Tying**

**1.    The Relevant Markets**

The essence of CedarCrestone's antitrust claim is its contention that "Oracle has unlawfully tied software upgrade licenses for Oracle ERP software such as PeopleSoft and E-Business suites (the tying product and market) to its own tax and regulatory support

services (the tied product and market) by offering the two separate products exclusively to licensees as a 'Software Upgrade License and Support' package." Dkt. No. 30 at 51 ¶ 62. CedarCrestone alleges that when Oracle sells a license for ERP software, that license typically does not expire. *Id.* at 52 ¶ 65. However, simply purchasing a license to Oracle ERP software does not automatically entitle licensees to either the new versions of the software, or more modest bug fixes and patches. *Id.* at 52-53 ¶ 65. In order to obtain the upgrade license for new versions, Oracle licensees must purchase an annual contract for a "Software Upgrade License and Support" ("SULS") bundle. *Id.* at 53 ¶ 65. If a licensee does not purchase this annual contract, or allows the contract to lapse, the licensee cannot access new versions of Oracle ERP software without relicensing or paying for back-support plus a penalty. *Id.* at 53 ¶ 65, 42-43 ¶¶ 34-35.

The SULS bundle also includes tax and regulatory support for Oracle ERP software. *Id.* at 53 ¶ 66. CedarCrestone alleges that the ERP software upgrades and tax and regulatory support for Oracle's ERP software are separate products because they have distinct functions, and there is a separate demand and market for the two products. *Id.* at 51-52 ¶¶ 62-63. Oracle ERP software applications consist of proprietary Oracle code that runs on computers and provides complex functionality for managing administrative functions at large institutions. *Id.* Many of the processes performed by Oracle's ERP software (e.g. payroll) require licensees to be in compliance with tax and regulatory requirements that are ever-changing. *Id.* at 52 ¶ 64. A tax and regulatory update is a patch designed to work with the underlying software and ensure that the software code is using inputs reflecting the current state of tax and regulatory obligations. *Id.* at 52 ¶ 63. By contrast to the market for Oracle ERP software which is proprietary, the downstream market for tax and regulatory support on Oracle ERP software is not proprietary or limited to Oracle and "there historically have been and still is competition in that market." *Id.* The separate demand for the two products is reflected by the fact that more than 10% of Oracle ERP software licensees chose to purchase tax and regulatory updates from third parties. *Id.*

Oracle does not sell either the software upgrade license or the tax and regulatory

support as a stand-alone product. *Id.* at 53 ¶ 66.  Oracle requires its ERP software clients to buy Oracle tax and regulatory updates in order to be eligible to receive essential software patches and fixes to and the right to receive new versions of Oracle ERP software. *Id.* at 38 ¶ 29.  Any Oracle ERP software licensee who chooses to use a third party tax and regulatory support vendor either would be forced to pay Oracle for Oracle tax and regulatory support services it is not using, or would have to forego the right to software updates and bug fixes. *Id.* at 41 ¶ 32.

In addition to being a provider of tax and regulatory support services, CedarCrestone is also an Oracle licensee, having originally purchased a license for PeopleSoft software in 1999. *Id.* at 55 ¶ 71.  Since Oracle purchased PeopleSoft in December 2004, CedarCrestone has also purchased annual SULS packages. *Id.*  In 2011, CedarCrestone relicensed all of its Oracle PeopleSoft applications as part of a license expansion and migration to obtain Canada payroll capacity. *Id.* at 41 ¶ 31.  "During the relicensing process, CedarCrestone was told that if it wanted to purchase rights to the software upgrade license (and avoid the penalty incurred by purchasing those rights at a later date), then the only option was to purchase the software upgrade license and support bundle that also included tax and regulatory support." *Id.* at 55 ¶ 71, 41 ¶ 31.

## 2.      The Alleged Unlawful Tying

CedarCrestone alleges that Oracle has sufficient economic power in the tying market (as the only provider of Oracle ERP software upgrade licenses) to appreciably affect the competition in the tied market for tax and regulatory support. *Id.* at 53 ¶ 67.  Because Oracle is the only provider of software upgrades, bug fixes, and patches—all highly valuable, if not indispensable, products for businesses that have bought licenses to Oracle ERP software applications—this significant advantage enables Oracle to condition the availability of software upgrade licenses on acceptance of the bundled SULS contract. *Id.* CedarCrestone alleges that since Oracle purchased PeopleSoft in 2004, Oracle has maintained a 100% monopoly share of the tying market for its own ERP software, including PeopleSoft and E-Business Suites, and new releases of and upgrades to that ERP software.

*Id.* at 38 ¶ 27, 52 ¶ 64.  By bundling its tax and regulatory support offerings with the software itself, Oracle has been able to create and maintain a multi-billion dollar revenue stream from its support business, and prevent licensees from seeking out third-party vendors for maintenance needs in what would otherwise be a competitive market.  *Id.* at 40 ¶ 30, 38 ¶ 27, 41 ¶ 32, 52 ¶ 63, 54 ¶ 69.

CedarCrestone also alleges that Oracle has a monopoly share in the downstream market for tax and regulatory updates to Oracle ERP software applications.  *Id.* at 38 ¶ 28. That share has historically exceeded 80% of the market, with other competitors, including CedarCrestone, Rimini Street, and TomorrowNow, making up the remainder.  *Id.* CedarCrestone alleges that there are at least 5,000 Oracle ERP software licensees.  *Id.*  Over the entire life of its tax and regulatory business line, from 2002 through the end of 2012, CedarCrestone serviced approximately 95 such clients in total, and also "in an effort to be a good Oracle partner," worked to limit its tax and regulatory client base to clients that Oracle was unwilling to support.  *Id.* at 29 ¶ 9, 38 ¶ 27, 39 ¶ 28, 55 ¶ 72.  CedarCrestone made the decision to close down its Tax/Regulatory Support business before this lawsuit was filed, in the hopes of cooperating with Oracle and maintaining its broader Oracle relationship.  *Id.* at 32 ¶ 14.  Rimini Street has publicly stated that it has approximately 525 ERP software tax and regulatory update clients in total, although some of these clients use ERP software platforms other than Oracle.  *Id.* at 39 ¶ 28.  TomorrowNow, which in 2008 shut down its tax and regulatory support business, serviced fewer than 300 ERP software tax and regulatory update clients prior to exiting the business.  *Id.*  After TomorrowNow's and CedarCrestone's exit from the market, which CedarCrestone claims was due to pressure from Oracle, Rimini Street remained the only significant competitor, leaving Oracle with an approximate 89.5% share of the tax and regulatory support market.  *Id.* at 27 ¶ 2, 39 ¶ 28, 52 ¶ 64.  Other companies that previously provided tax and regulatory support for Oracle ERP software include Spinnaker and netCustomer, although netCustomer appears to have left the market.  *Id.* at 54 ¶ 69.  CedarCrestone alleges that Oracle has achieved its monopoly share in the market for tax and regulatory supports by unlawfully tying the

derivative purchase of its tax and regulatory services to the purchase of the primary product at issue—Oracle ERP software and software updates. *Id.* at 27 ¶ 2.

CedarCrestone further alleges that the unlawful tying enables Oracle to charge prices for its tax and regulatory updates that are significantly higher than the competition. *Id.* at 27 ¶ 2. Oracle's bundled product offering is generally priced at 22 percent of the cost of the underlying license to the Oracle ERP software, subject to annual escalation. *Id.* at 40 ¶ 30, 53 ¶ 65. Licensees are also subject to additional license expansion fees. *Id.* at 40 ¶ 30. Although Oracle does not offer its tax and regulatory update services separately, in a publicly available presentation to the United States Department of Energy Oracle quoted a price for tax and regulatory updates for an unsupported ERP application at $50,000 annually in addition to the bundled product offering. *Id.* By comparison, CedarCrestone alleges that, while its tax and regulatory support services were not precisely comparable, it was able to provide a greater quantum of service to clients for approximately 15% less per year than Oracle. *Id.* Rimini Street charges clients 50% of what Oracle charges for tax and regulatory support. *Id.* at 42 ¶ 33, 54 ¶ 68.

In addition to the higher prices, CedarCrestone alleges that Oracle's tying arrangement has caused higher barriers to entry in the downstream market for tax and regulatory updates. *Id.* at 53-54 ¶ 68. Oracle has made private statements to software users and/or potential software users stating that Oracle is the only provider of support and maintenance for Oracle ERP software. *Id.* On July 13, 2012, in a publicly available letter, Oracle support sales representative Raymond Paul wrote to the City of Oklahoma City and claimed Oracle was "the sole source of technical support" for Oracle ERP software licensees. *Id.* According to CedarCrestone, these statements serve to discourage Oracle ERP software licensees from considering using third party tax and regulatory support, and as a consequence make it undesirable for third parties to attempt to compete with Oracle. *Id.* CedarCrestone further alleges that, when it suited Oracle's needs and helped keep software licensees in the fold (as in the case of clients Oracle was unwilling to support for some reason), Oracle has partnered with and even referred clients to third-party support

Case No. 12-cv-04626 NC
ORDER GRANTING MOTION TO
DISMISS COUNTERCLAIMS

1   providers, such as CedarCrestone. *Id.* at 29 ¶ 9, 38 ¶ 27, 54 ¶ 68.

2       CedarCrestone asserts that, by forcing it to purchase unlawfully tied products as a

3   bundle, Oracle has harmed competition and CedarCrestone directly by causing

4   CedarCrestone to significantly overpay for tax and regulatory support services. *Id.* at 41-42

5   ¶ 33, 55 ¶¶ 72-73.

6                              **II. STANDARD OF REVIEW**

7       A motion to dismiss a counterclaim brought under Federal Rule of Civil Procedure

8   12(b)(6) is evaluated under the same standard as a motion to dismiss a plaintiff's complaint.

9   To survive a motion to dismiss, a counterclaim must contain sufficient factual matter,

10  accepted as true, to state a claim for relief that is plausible on its face. *Bell Atl. Corp. v.*

11  *Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The

12  plausibility standard is not akin to a probability requirement, but it asks for more than a

13  sheer possibility that a defendant has acted unlawfully . . . . Where a complaint pleads facts

14  that are merely consistent with a defendant's liability, it stops short of the line between

15  possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (quoting

16  *Twombly*, 550 U.S. at 556–57) (internal quotation marks omitted).  A court is not required

17  to accept as true conclusory allegations, unreasonable inferences, or unwarranted

18  deductions of fact. *See Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031

19  (9th Cir. 2008).  Additionally, a pleading that offers "labels and conclusions" or "a

20  formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at

21  555.  Where a court dismisses for failure to state a claim under Rule 12(b)(6), it should

22  normally grant leave to amend unless it determines that the pleading could not possibly be

23  cured by the allegation of other facts. *Cook, Perkiss & Liehe v. N. Cal. Collection Serv.*,

24  911 F.2d 242, 247 (9th Cir. 1990).

25  //

26

27

28

# III. DISCUSSION

## A.    Oracle's Unopposed Request for Judicial Notice Is Granted.

As a general rule, a court may not look to matters beyond the complaint without converting a motion to dismiss into one for summary judgment. *Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 983 (N.D. Cal. 2010) (Laporte, J.) (citations omitted). However, a court may take judicial notice of "material which is either submitted as part of the complaint or necessarily relied upon by the complaint," as well as "matters of public record." *Id.* Under Federal Rule of Evidence 201(b), a judicially noticed fact must be one not subject to reasonable dispute in that it is either: (1) generally known within the territorial jurisdiction of the trial court; or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *See id.*

Oracle requests that the Court take judicial notice of the following documents in support of its motion to dismiss: (1) an online article entitled *ERP Support: How Far Will Oracle Go to Protect Golden Egg?*, dated February 24, 2010; (2) the May 12, 2011 version of Oracle's Software Technical Support Policies; and (3) the September 20, 2005 version of Oracle's Technical Support Policies. Dkt. No. 39. CedarCrestone does not oppose this request for judicial notice. Dkt. No. 43 at 13 n.1. The Court hereby grants Oracle's request and takes judicial notice of all exhibits identified above under Federal Rule of Evidence 201.

## B.    CedarCrestone Fails to State a Claim for Unlawful Tying.

### 1.    An Actionable Tying Claim Must Plead Market Power in a Relevant Market.

"A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier. . . . Such an arrangement violates § 1 of the Sherman Act if the seller has appreciable economic power in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market." *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 461-62 (1992)

(internal quotation marks and citations omitted).  "In order to state a valid claim under the Sherman Act, a plaintiff must allege that the defendant has market power within a 'relevant market.'  That is, the plaintiff must allege both that a 'relevant market' exists and that the defendant has power within that market."  *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1044 (9th Cir. 2008).  *See also PSI Repair Services, Inc. v. Honeywell, Inc.*, 104 F.3d 811, 815 n.2 (6th Cir. 1997) ("market power in the tying product market is an indispensable requirement under either per se or rule-of-reason analysis"); *Red Lion Med. Safety, Inc. v. Ohmeda, Inc.*, 63 F. Supp. 2d 1218, 1237 n.15 (E.D. Cal. 1999) (observing that the per se tying claim and a tying claim under the rule of reason have merged in recent years).

There is no requirement that the "market power" or "relevant market" elements of an antitrust claim be pled with specificity.  *Newcal*, 513 F.3d at 1045 (citation omitted).  While the validity of the relevant market is typically a factual issue, there are some legal principles that govern the relevant market definition, and a complaint may be dismissed under Rule 12(b)(6) if that definition is facially unsustainable.  *Id.* (citations omitted).  As a general rule, the relevant market must be a product market and must encompass the product at issue as well as all economic substitutes for the product.  *Id.* (citation omitted).

In *Newcal*, the Ninth Circuit held that while "the law permits an antitrust claimant to restrict the relevant market to a single brand of the product at issue," it "prohibits an antitrust claimant from resting on market power that arises solely from contractual rights that consumers knowingly and voluntarily gave to the defendant."  *Id.* at 1048.  "[I]n determining whether the defendant's market power falls in the . . . category of contractually-created market power or in the *Eastman Kodak* category of economic market power, the law permits an inquiry into whether a consumer's selection of a particular brand in the competitive market is the functional equivalent of a contractual commitment, giving that brand an agreed-upon right to monopolize its consumers in an aftermarket.  The law permits an inquiry into whether consumers entered into such 'contracts' knowing that they were agreeing to such a commitment."  *Id.* at 1048-49.  *See also Datel*, 712 F. Supp. 2d at

987 ("[T]o establish a single-brand aftermarket under *Kodak* and *Newcal*, the restriction in the aftermarket must not have been sufficiently disclosed to consumers in advance to enable them to bind themselves to the restriction knowingly and voluntarily."); *In re Apple and AT & TM Antitrust Litig.*, 596 F. Supp. 2d 1288, 1305 (N.D. Cal. 2008) (Ware, J.) ("Ultimately, the dispositive issue is whether Plaintiffs 'knowingly placed [Defendants] in a monopoly position' in the alleged . . . aftermarket.").

In *Kodak*, the plaintiffs were independent service organizations that serviced copying and micrographic equipment manufactured by Kodak. *Kodak*, 504 U.S. at 455. Kodak adopted policies that limited the availability of its parts, which made it more difficult for the plaintiffs to compete with Kodak in servicing Kodak equipment. *Id.* The plaintiffs alleged that Kodak unlawfully tied the sale of service for Kodak machines to the sale of Kodak-compatible parts, a market in which Kodak had a monopoly. *Id.* at 459. The Court explained that in certain circumstances, a single brand of a product or service can constitute a separate market. *Id.* at 482. "Because service and parts for Kodak equipment are not interchangeable with other manufacturers' service and parts, the relevant market from the Kodak equipment owner's perspective is composed of only those companies that service Kodak machines." *Id.*

The principal issue before the Supreme Court in *Kodak* was "whether a defendant's lack of market power in the primary equipment market precludes-as a matter of law-the possibility of market power in derivative aftermarkets." *Id.* at 455. Kodak argued that, because competition existed in the equipment market, it could not raise prices of service and parts above the level that would be charged in a competitive market because any such increase in profits would be offset by a corresponding loss in profits from lower equipment sales. *Id.* at 465-66. The Court declined to adopt such a legal presumption against the finding of market power, and held that there was a question of fact "whether information costs and switching costs foil the simple assumption that the equipment and service markets act as pure complements to one another." *Id.* at 466-77. The Court "rejected the possibility that a consumer's decision to purchase Kodak-brand equipment (in an indisputably

competitive equipment market) was functionally equivalent to the signing of a contractual provision that gave Kodak the exclusive right to service its equipment . . . on the ground that the consumers could not, at the time of purchase, reasonably discover that Kodak monopolized the service market and charged supracompetitive prices for its service." *Newcal*, 513 F.3d at 1048 (citing *Kodak*, 504 U.S. at 473-78).

As in *Kodak*, the Ninth Circuit in *Newcal* found that a single-brand aftermarket constituted a relevant antitrust market. *Newcal*, 513 F.3d at 1050. Plaintiff Newcal and defendant IKON were in the copier-equipment business. *Id.* at 1043. The two companies competed both in the primary market for equipment leases and initial service contract, and in the aftermarket for replacement equipment. *Id.* Newcal alleged that IKON defrauded its customers by amending their lease agreements and service contracts without disclosing that the amendments would lengthen the term of the original agreements for the purpose of "shield[ing] IKON customers from competition in the aftermarkets for upgrade equipment and for lease-end services." *Id.* at 1043-44. The court found that Newcal alleged the existence of two separate but related markets comprising of a competitive initial market for copier leases and copier service, and a derivative aftermarket for replacement equipment, including markets for lease "buy outs" and for "lease-end service." *Id.* at 1049. According to the complaint, IKON achieved market power in the aftermarket not through contractual provisions that it obtained in the initial market, but, rather, through its relationship with its consumers. *Id.* at 1050. The complaint further alleged that "market imperfections, as well as IKON's fraud and deceit, prevent[ed] consumers from realizing that their choice in the initial market will impact their freedom to shop in the aftermarket." *Id.*

The distinction between contractual and economic market power was also applied recently by Judge Laporte in *Datel*, 712 F. Supp. 2d 974. The court in *Datel* held that a developer of video game enhancement products stated a Sherman Act claim against the manufacturer of the Xbox 360 gaming system for monopolization of the aftermarket for gaming system accessories and add-ons. *Id.* at 986-90. Balancing the *Newcal* factors, the court found that there was no clearly binding contractual restriction on the market, that

Case No. 12-cv-04626 NC
ORDER GRANTING MOTION TO
DISMISS COUNTERCLAIMS                    12

plaintiff had sufficiently alleged that the aftermarket was "wholly derivative and dependent on the primary market," that the contractual relationship, rather than any contractual provision, gave defendant special access to its customers, and that there were market imperfections and representations by defendant that lead its customers to mistakenly believe that they will be free to shop for third-party alternatives in the aftermarket. *Id. See also In re Apple*, 596 F. Supp. 2d at 1303-06 (finding that aftermarket for iPhone voice and data services was sufficiently alleged where customers had executed a two-year contract for provision of services with AT&T Mobility, defendants failed to disclose the existence of exclusivity provision restricting iPhone users to AT&T Mobility services for five years, and technologically prevented customers from switching carriers).

The court in *Datel* also summarized and distinguished cases that fell into the category of contractually-created market power and did not state a legally cognizable aftermarket claim. *Datel*, 712 F. Supp. 2d at 987-88. *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436-41 (3d Cir. 1997) (rejecting a single brand aftermarket relating to pizza making ingredients for Domino's franchisees, where the franchisees signed an agreement to operate a Domino's Pizza location, and under that same agreement were required to purchase pizza ingredients from Domino's or authorized vendors); *Forsyth v. Humana, Inc.*,  114 F.3d 1467, 1476 (9th Cir.1997) (rejecting a claim for monopolization of the market for hospital services for a single company's insureds because the purported restraint arose from contract provisions disclosed in advance in the plaintiffs' insurance policies); *Apple Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1200-02 (N.D. Cal. 2008) (Alsup, J.) (finding that defendant failed to plead a plausible aftermarket for Mac OS-compatible hardware because through "its End User License Agreement and other means, Apple specifically restricts the use of Mac OS to Apple-labeled computer hardware systems," and "customers, therefore, knowingly agree to the challenged restraint.").

For the reasons set forth below, the Court finds that CedarCrestone has not sufficiently alleged that it falls within the *Newcal* category of economic as opposed to contractually-created market power.

### 2.    CedarCrestone Has Not Alleged Sufficient Facts to State a Cognizable Single-Brand Aftermarket Claim.

The relevant market here is not the primary market for ERP software, in which Oracle faces competition, but the aftermarket for regulatory and tax support services for Oracle ERP software.  *See* Dkt. No. 38 at 11:5-7, 14:13-18; 30 at 27 ¶ 6, 30 ¶ 12.  The parties appear to be in agreement that *Kodak* and *Newcal* principles governing single-brand aftermarkets control our analysis of CedarCrestone's unlawful tying claim in this case. Furthermore, while a substantial part of the parties' briefing is devoted to the issue of whether or not an aftermarket claim must allege a change of policy, the parties appear to agree that such an allegation is not always required.  *See* Dkt. No. 46 at 8:1-16; 43 at 13:5-8.  The issue before the Court is whether CedarCrestone has alleged sufficient factual matter to state a claim that the challenged aftermarket restraint (the tying of software upgrade licenses to tax and regulatory services) is not knowingly and voluntarily accepted by the software licensees, but instead arises from Oracle's unique position in the market for software upgrade licenses for Oracle ERP software.

In determining whether a consumer's selection of a brand in the market is the functional equivalent of a contractual commitment or instead permits a claim based on a single-product aftermarket, the Ninth Circuit in *Newcal* identified four relevant considerations, which were recently applied in *Datel*.  *See Newcal*, 513 F.3d at 1049; *Datel*, 712 F. Supp. 2d at 990.  First, courts look at whether plaintiff has alleged an aftermarket that is "wholly derivative from and dependent on the primary market," allowing the defendant to exploit its unique position in the primary market to monopolize the aftermarket in which its power is not contractually mandated.  *See Newcal*, 513 F.3d at 1049-50. CedarCrestone here alleges that, "[b]ecause Oracle is the only provider of software upgrades, bug fixes, and patches—all highly valuable, if not indispensable, products for businesses that have bought licenses to Oracle ERP software applications—this significant advantage enables Oracle to condition the availability of software upgrade licenses on acceptance of the bundled contract for Software Upgrade License and Support," Dkt. No. 30 at 53 ¶ 67, "thereby achieving market power in what would otherwise be a competitive

market for tax and regulatory support for Oracle ERP software." *Id.* at 54 ¶ 69.  The Court finds that CedarCrestone has sufficiently alleged an aftermarket for tax and regulatory support that is wholly derivative of the primary market for Oracle ERP software.

The second relevant consideration is whether the challenged restraint is part of the initial market, or whether it relates only to the aftermarket. *Newcal*, 513 F.3d at 1050.  In *Newcal*, the challenged agreements that restrained the competition in the aftermarket were only obtained after the initial contract, and thus were part of the separate and derivative aftermarket. *Id.*  Oracle contends that CedarCrestone's own counterclaims allege that "the challenged restraint – the SULS bundle – is presented to software customers, and purchased, right alongside the initial software license," and "during software license negotiations."  Dkt. No. 46 at 13 n.8, 17:1-3 (citing paragraphs 26, 31, 40, 42, and 71 of the counterclaims).

Oracle's citations to the counterclaims do not support its contention.  Paragraph 26, for example, alleges: "Oracle does not offer a software licensee the opportunity to receive software upgrades and new software releases unless that licensee also agrees to purchase Oracle support and maintenance services, including tax and regulatory updates.  Oracle does not offer these products separately, but only as part of a bundled package."  Dkt. No. 30 at 36-37 ¶ 26.  Nothing in this paragraph shows that the licensee is informed about the bundling of software upgrade licenses and regulatory and tax support during the initial software negotiation.  Neither could such a fact be inferred as a matter of law from the allegation that "[d]uring the relicensing process, CedarCrestone was told that if it wanted to purchase rights to the software upgrade license (and avoid the penalty incurred by purchasing those rights at a later date), then the only option was to purchase the software upgrade license and support bundle that also included tax and regulatory support." *Id.* at 55 ¶ 71; *see also id.* at 41 ¶ 31.  While CedarCrestone relicensed its PeopleSoft applications in 2011, it originally purchased a license for PeopleSoft software in 1999, and began purchasing annual SULS packages in December 2004. *Id.* at 55 ¶ 71, 41 ¶ 31.  These allegations, therefore, do not establish that the challenged restraint was part of

CedarCrestone's (or any other licensee's) *initial* software license purchase.  Even more unclear is the relevance of the allegations in paragraphs 40 and 42 relied on by Oracle regarding a customer (LACCD)'s simultaneous contract negotiation with Oracle as the software vendor and CedarCrestone as a consulting services vendor.  *See* Dkt. No. 30 at 44 ¶ 40, 45 ¶ 42.  There is nothing in these allegations that addresses the bundling of tax and regulatory support with the ERP software license upgrades.  In fact, paragraph 41 expressly states that "[t]he LACCD business did not relate to the small Tax/Regulatory Support part of CedarCrestone's business that is at issue in this case."  *Id.* at 45 ¶ 41.

On the other hand, notably absent in CedarCrestone's counterclaims is any allegation that the bundling of tax and regulatory support and license upgrades is not disclosed during the initial negotiation and purchase of the software license.  As CedarCrestone's counsel acknowledged at the hearing on the motion to dismiss, there are no allegations in the counterclaims addressing that issue.  Dkt. 53 at 11:5-12:8, 20:8-12.  The Court finds that the counterclaims are ambiguous as to "whether the challenged restraint is part of the initial market."  *See Datel*, 712 F. Supp. 2d at 990.

The third relevant consideration is the alleged source of defendant's market power.  *See Newcal*, 513 F.3d at 1050.  As discussed above, CedarCrestone alleges that Oracle's unique position in the primary software market enables Oracle to monopolize the aftermarket.  Oracle contends that its "software license provisions and other publicly available information plainly disclose the terms on which support is available – the SULS bundle that expressly includes 'tax, legal, and regulatory updates,'" and thus, like the customers in *Psystar*, Oracle's licensees knowingly agree to the challenged restraint."  Dkt. Nos. 38 at 19:11-18; 46 at 6:2-16, 17:6-9.  Unlike this case, however, the counterclaim in *Psystar* alleged that "by its End User License Agreement and other means, Apple specifically restricts the use of Mac OS to Apple-labeled computer hardware systems." *Psystar*, 586 F. Supp. 2d at 1201.  By contrast, the counterclaims here do not allege any provision in the *initial* software license contract that gives Oracle the right to require software licensees to purchase tax and regulatory support only from Oracle.  *See Datel*, 712

F. Supp. 2d at 990 (viewing the allegations in the light most favorable to plaintiff and interpreting contract ambiguities against the drafter).  On the other hand, in both *Newcal* and *Datel*, the plaintiff alleged that the defendant did not achieve market power in the aftermarket through contractual provisions obtained in the initial market.  *Newcal*, 513 F.3d at 1050; *Datel*, 712 F. Supp. 2d at 981, 990.  While in its opposition to the motion to dismiss CedarCrestone argues that the license agreement for Oracle's ERP software and the Software Technical Support policies contain no terms limiting the licensee's ability or right to obtain tax and regulatory updates from sources other than Oracle, there are no such allegations in the counterclaims.  Dkt. No. 43 at 16:15-26.  CedarCrestone asserts, however, that it could "plead further specific detail regarding the many material aspects of Oracle's tying practices that are not visible to an Oracle ERP software licensee at the time it enters into a software license, but become known only later."  *Id.* at 18:4-14.

The fourth relevant consideration in *Newcal* was plaintiff's allegation that market imperfections, as well as defendant's fraud and deceit, prevented consumers from realizing that their choice in the initial market will impact their freedom to shop in the aftermarket.  *See Newcal*, 513 F.3d at 1050.  In those circumstances, competition in the initial market does not necessarily suffice to discipline anticompetitive practices in the aftermarket.  *Id.* Similarly, in *Datel*, plaintiff alleged that defendant's representations and market imperfections lead defendant's customers to mistakenly believe that they will be free to shop in the aftermarket despite their choice in the primary market.  *Datel*, 712 F. Supp. 2d at 990.  For example, the presence of a USB port in the Xbox 360 console suggested to consumers that third party accessories and add-ons would be compatible and permissible. *Id.* at 981.  Plaintiff in *Datel* also alleged that the defendant misled customers into a reasonable belief at the time of purchasing an Xbox 360 console that third-party accessories and add-ons were available when defendant's spokesperson stated that the Xbox 360 "also drives a ton of third-party spend," and noted the availability of "a lot of third party alternatives." *Id.*

Oracle contends that CedarCrestone cannot allege a policy change, information costs,

or market imperfections because CedarCrestone itself has alleged that the SULS bundle is "fully disclosed, publicly known, and 'knowingly' and 'voluntarily' agreed to, right up front." Dkt. No. 46 at 14:17-19. In support, Oracle relies on the allegations that (1) CedarCrestone has bought the SULS bundle since 2004; (2) "[d]uring th[e] process" of relicensing the software in 2011, CedarCrestone "was presented with only one option" – the SULS bundle; (3) Oracle's Technical Support Policies state that the SULS bundle includes both "tax, legal, and regulatory updates" and "major product and technology releases"; and (4) CedarCrestone knew that Oracle generally priced support at "22 percent of the cost of the underlying license to the Oracle ERP software and the cost of the bundled product offering typically escalates in cost each year thereafter." *Id.* at 13:15-14:16; 38 at 17:21-19:10. Contrary to Oracle's contention, these allegations do not establish as a matter of law that, *at the time of the initial contract*, Oracle's software licensees knowingly agreed to Oracle's monopolizing of the tax and regulatory support market.

In opposing the motion to dismiss, CedarCrestone asserts that it has pleaded the existence of information and switching costs. *See* Dkt. No. 43 at 13:8-10 (citing allegation in the counterclaims that "[t]he overall cost of implementing and customizing a new software upgrade typically will exceed $1 million," Dkt. No. 30 at 30 ¶ 11). However, the only factual matter upon which CedarCrestone relies in support for its information cost argument is based on an article that purportedly "explains that software maintenance fees, like the SULS, are 'typically spread out among enterprises' financial ledgers and departments amid a sprawl of myriad vendor contracts, [and] can go unnoticed unless examined and calculated in their entirety.'" Dkt. No. 43 at 13:8-21 (citing Dkt. No. 39-1). Oracle responds that this article is not specific to Oracle ERP software, but refers to the entire "world of maintenance and support . . . inside today's businesses," and also confirms that Oracle customers know what they are buying. Dkt. No. 46 at 14:5-16. The Court finds that CedarCrestone has not alleged that Oracle changed its policy in order to lock-in customers, that it misrepresented its tying practices, or that its tying policy was otherwise not generally known. Therefore, unlike the plaintiffs in *Kodak*, *Newcal*, and *Datel*,

CedarCrestone has not alleged sufficient facts showing that Oracle's ERP software licensees were prevented from realizing that their choice in the initial market will impact their freedom to shop in the aftermarket. *See Newcal*, 513 F.3d at 1050; Dkt. 53 at 14:4-7, 20:8-12. CedarCrestone has indicated that, if given leave to amend, it could plead additional facts on this issue. Dkt. No. 43 at 13:8-21, 18:4-14.

Oracle submits that leave to amend would be futile because CedarCrestone has made allegations that are inconsistent with its prior pleadings, and that "[h]aving taken all sides of the antitrust issue, CedarCrestone has nowhere left to go." *See* Dkt. No. 38 at 22:7-18. Specifically, Oracle argues that CedarCrestone has been inconsistent in alleging the existence and extent of competition in the downstream market for support services. *Id.* The Court finds that, while the alleged inconsistencies might potentially raise factual issues with respect to Oracle's purported exploitation of the aftermarket, they do not render futile an amendment of the counterclaim.

On balance, the relevant factors weigh in favor of granting Oracle's motion to dismiss with leave to amend. As the Ninth Circuit made clear in *Newcal*, the law "prohibits an antitrust claimant from resting on market power that arises solely from contractual rights that consumers knowingly and voluntarily gave to the defendant." *Newcal*, 513 F.3d at 1048. While CedarCrestone's allegations that Oracle exploits its unique position in the primary market to monopolize the aftermarket "get[] the [counterclaim] close to stating a claim, . . . without some further factual enhancement it stops short of the line between possibility and plausibility of 'entitle[ment] to relief.'" *See Twombly*, 550 U.S. at 557. Here, CedarCrestone has not alleged sufficient facts showing that the alleged aftermarket restraint is not accepted knowingly and voluntarily by Oracle's licensees, as where the licensees are locked in due to high switching and information costs or a change in policy subsequent to the alleged lock-in. Accordingly, the Court DISMISSES with leave to amend CedarCrestone's second counterclaim for unlawful tying under the Sherman Act, 15 U.S.C. § 1.

//

1

**C.      CedarCrestone Fails to State a UCL Claim Based on Unlawful Tying.**

2          The parties agree that CedarCrestone's unfair competition claim alleges the same

3 conduct at issue in the unlawful tying claim.  *See* Dkt. Nos. 30 at 56 ¶¶ 75-78; 43 at 17:13-

4 23; 46 at 17:21-25.  Because the Court finds that CedarCrestone has failed to state an

5 unlawful tying claim, the unfair competition claim must also be dismissed.  *See Datel*, 712

6 F. Supp. 2d at 999; *Kentmaster Mfg. Co. v. Jarvis Prods. Corp.*, 146 F.3d 691, 695 (9th Cir.

7 1998), amended by *Kentmaster Mfg. Co. v. Jarvis Prods. Corp.*, 164 F.3d 1243 (9th Cir.

8 1999).  Accordingly, CedarCrestone's unfair competition claim is DISMISSED with leave

9 to amend.

10                                     **IV. CONCLUSION**

11          As CedarCrestone fails to allege the requisite market power to support its

12 counterclaims based on unlawful tying, the Court GRANTS Oracle's motion to dismiss

13 CedarCrestone's second and third counterclaims with leave to amend.  CedarCrestone has

14 28 days from the filing date of this order to file amended counterclaims curing the defects

15 described above.

16          IT IS SO ORDERED.

17          Date: April 3, 2013

18                                                          Nathanael M. Cousins
                                                           United States Magistrate Judge

19

20

21

22

23

24

25

26

27

28